### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JANICE DOUGLASS, | ) | |
| | ) | No. 12 CV 504 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | April 30, 2013 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Janice Douglass has documented physical and mental impairments, including back pain, depression, and post-traumatic stress disorder ("PTSD"). She applied for disability benefits in 2005, and in the eight intervening years she has watched her claim wend its way through a slow-moving administrative and judicial review process. Her claim has twice been denied by an administrative law judge ("ALJ"), and is now before this court at the summary judgment stage for a second time. After all of this time in legal limbo, Douglass finds herself in front of a court whose task it is not to decide whether the evidence suggests that she is disabled, but only to ensure that the ALJ who reviewed her claim gave reasons for denying it that are supported by substantial record evidence. *See Pepper v. Colvin*, ___F.3d___, 2013 WL 1338123, at *8 (7th Cir. Apr. 4, 2013). Although this is a case

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

where reasonable minds could disagree over whether Douglass can perform substantial gainful work despite her impairments, at the end of the day, this court finds that the ALJ discharged his duty to explain, using reasons supported by the record, why he does not believe that her impairments are as limiting as she claims they are. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (noting that the court must affirm an ALJ's adequately supported decision "even if reasonable minds could differ concerning whether [the claimant] is disabled" (internal quotation omitted)). Accordingly, and for the following reasons, this court is bound to deny Douglass's motion for summary judgment and to grant the Commissioner's cross-motion for summary judgment:

## Procedural History

Douglass applied for disability insurance benefits and supplemental security income on July 22, 2005, claiming that she had been disabled since 2003 by a combination of back pain, carpel tunnel syndrome, depression, and anxiety. (Administrative Record ("A.R.") 66-68.) After her applications were denied initially and upon reconsideration, Douglass was granted a hearing before an ALJ. (Id. at 47-53.) Following the hearing, the ALJ issued a decision finding that Douglass is not disabled. (Id. at 11-23.) After the Appeals Council denied her request for review, (id. at 4-6), Douglass sought judicial review before this court. At the summary judgment stage, this court determined that the ALJ had not given adequate reasons for his credibility determination, and on June 29, 2010, it remanded the case for further proceedings. (Id. at 716-51.)

Following this court's decision, the ALJ held a new hearing at which Douglass testified and presented supplemental medical evidence. (Id. at 1038-81.) On October 28, 2011, the ALJ issued a decision again finding that Douglass is not disabled. (Id. at 697-712.) The Appeals Council did not assume jurisdiction over the case, so the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1484. On January 23, 2012, Douglass filed the current civil action for judicial review of the Commissioner's final decision. (R. 1.) The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

This court provided a detailed recitation of the record evidence from 2003-2008 in its June 2010 decision, and incorporates those facts by reference for purposes of the current opinion. (A.R. 718-33.) What follows below is a description of the record developed during the proceedings on remand.

## A.    Medical Evidence

In 2008 Douglass sought mental health services at North Central Behavioral Health Systems ("NCBHS"). (Id. at 993.) (She also sought services there in 2007 but stopped attending because of car problems. (Id. at 983.)) At her March 2008 intake appointment, Douglass described herself as depressed due to the combination of her untreated physical pain and grief stemming from the loss of her daughter, who was killed in a car accident in January 2007. (Id.) She underwent a psychiatric evaluation in May 2008 with Dr. Mark McVay, who described her as having "[h]uge and unresolved grief issues," as experiencing "marked health

impairment" in the form of back pain, and as having lingering issues connected to her history of being abused as a child. (Id. at 983-85.) Dr. McVay prescribed Trazodone and Celexa to treat Douglass's depression and what he described as her "sleep disturbances." (Id. at 993-94.) Later that month Dr. McVay evaluated Douglass again and found that her symptoms were "significantly improved globally" and she was not experiencing any medication side effects. (Id. at 977-78.) Douglass also began individual counseling, although by September 2008 she was discharged "due to non-participation." (Id. at 969-72.) The discharge note states that Douglass has a history of "poor engagement in services." (Id. at 972.)

In December 2008 Douglass returned to NCBHS to resume treatment, reporting that she was experiencing an increase in her depression and anxiety as the anniversary of her daughter's death approached. (Id. at 945.) She re-engaged in individual therapy, where she reported that she had gone off of her depression medication because she could not afford it. (Id. at 940-41.) In March 2009 Douglass reported sleeping for an hour or two but then being unable to fall back to sleep. (Id. at 918.) She was given new prescriptions for Celexa and Trazodone for depression and sleep disturbances. (Id. at 923-24.) A month later she reported that her symptoms had improved and that she was not experiencing any medication side effects. (Id. at 907-08.) In July 2009 Douglass again reported no medication side effects, but said that she was sleeping very poorly, although "a little better on Trazodone." (Id. at 896-97.)

In the fall of 2009 Douglass reported having some improvement in her moods and depression when she was on medication, which included Cymbalta and Zyprexa, but said that she had ongoing anxiety and stress over financial worries and her disability case. (Id. at 869.) Douglass denied any medication side effects. (Id. at 890.) She reported having back pain at a level of four out of ten and said that she was under a doctor's care for the pain. (Id. at 870.) The staff person who filled out a psychological assessment form checked all of the boxes pertaining to Douglass's functional areas for daily activities, noting that she is able to maintain a residence, cook, drive or use public transportation, take care of her home, shop, and care for her own hygiene. (Id. at 871.) They discussed a treatment goal of improving Douglass's anxiety, depression, grief, mood swings, and symptoms of PTSD. (Id. at 874.)

On December 11, 2009, an NCBHS clinician filled out a diagnostic review form, stating that Douglass had reported experiencing constant pain in her neck and back. (Id. at 855.) The clinician rated her Global Assessment of Functioning ("GAF") score as 52 (it had been as low as 45 in 2008).[2] (Id. at 856, 975.) A month later Douglass was evaluated by Dr. Mohammad Sami, who noted that she had been dealing with back pain for years but could not afford treatment. (Id. at 863.) He wrote that she was "waiting for disability." (Id.) Dr. Sami noted that she

---

[2] A GAF score is used to measure an individual's overall functional capacity. A GAF score in the 41-50 range indicates serious impairments in social, occupational, or school functioning. A score in the 51-60 range indicates moderate difficulties in those areas. *Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. 2000).

reported having no side effects from her medications, but that she was anxious and depressed. (Id. at 864-65.)

Progress notes show that between December 2009 and March 2010, Douglass attended only one of her ten scheduled group therapy appointments. (Id. at 852-54, 903.) For eight of the nine times she did not attend, the notes reflect that she did not call to cancel. (Id.) During that time she was scheduled to attend four individual therapy sessions, but she only attended two. (Id. at 852, 902-03.) The notes from individual therapy state that Douglass reported not taking her anxiety medication because of "funding problems." (Id. at 852.) She also said she was having difficulty with transportation and discussed with the therapist using a minibus to get to group sessions. (Id.) But after she repeatedly missed the group sessions, on March 4, 2010, NCBHS again closed her file and canceled her scheduled appointments "due to lack of engagement." (Id. at 853.)

In 2009 and 2010 Douglass pursued treatment for her back pain through the Health Center of Eastern LaSalle County in Ottawa, Illinois ("the pain clinic"). The hand-written notes from those visits are difficult to read, but they convey that she reported having back and neck pain for "years." (Id. at 1003.) They also reflect that she was a "no show" for several scheduled appointments. (Id. at 1000-03.) The notes also show that she began taking Seroquel, a medication that treats depression and bipolar disorder, but it is unclear from the record when that prescription began. (Id. at 999.)

During this period Douglass went to an emergency room seeking treatment for her back pain on three occasions. On February 27, 2009, she told E.R. personnel that her then-current pain level was at a nine out of ten. (Id. at 841.) The doctor who examined her noted that she was ambulatory upon arrival and did not appear to be in any distress from pain. (Id. at 842-43.) Forty minutes after her arrival Douglass described her pain as being at a two or three out of ten. (Id. at 844.) She was discharged with a prescription for Vicodin. (Id. at 839, 846.)

Douglass again sought E.R. treatment in August 2010, where the intake form describes the intensity of her pain as mild. (Id. at 1010.) She was discharged with another Vicodin prescription and described her pain level as a two out of ten at discharge. (Id. at 1008, 1013.) Two months later Douglass again reported to an E.R. with back pain. (Id. at 1005.) She was ambulatory on arrival and reported being at six out of ten on the pain scale. (Id.) She was given a shot of morphine and discharged in good condition. (Id. at 1005-06.)

## B.    Hearing Testimony

At her hearing on remand, which took place on September 19, 2011, Douglass again described her pain, depression, and other symptoms to the ALJ. Douglass said that on a good day her pain level is at a four or five out of ten, but that on a bad day it can be at a nine or ten. (A.R. 1055.) She stuck to that assessment even when the ALJ asked her to consider ten as representing "the most excruciating pain imaginable." (Id. at 1062-63.) Douglass testified that her pain level during the hearing was at "about a four." (Id. at 1063.) When the ALJ asked her to explain

how her pain had changed over time, Douglass estimated that her typical pain level in 2005, 2007, and 2009 was about an eight or nine. (Id. at 1063-64.) But she also testified that her back pain had gotten "a little bit worse" since her July 2008 hearing. (Id. at 1048.)

The ALJ asked Douglass to explain what kind of treatment she was getting for her pain, and she explained that because she did not have medical insurance she was pursuing treatment at a free clinic. (Id. at 1050.) Douglass said that she often missed appointments because of transportation problems. (Id.) Douglass explained that she relies on a bus to get her to the clinic, and it does not always run at the time of her appointments. (Id. at 1050-51.) When the ALJ pressed her to explain why she had not called to cancel her appointments when she could not get there, she testified that she "probably didn't have a phone at the time." (Id. at 1060.) Douglass said that she did not go to the emergency room more often for treatment because she did not know anyone who could take her and because she was too embarrassed to call an ambulance when she could not afford to pay for it. (Id. at 1066.)

Douglass also described her attempts to get medical attention for her mental health issues, which she said include depression and PTSD. (Id. at 1053.) She testified that those conditions sometimes cause her to stay in bed for days. (Id.) Douglass said that a counselor at NCBHS recommended that she attend group therapy for her PTSD, but that she found the sessions overwhelming. (Id. at 1049-50.) Douglass explained that after she was discharged from the program for not

8

attending, she made numerous attempts to get back in but was told that there were not any government programs available to help potential patients who do not have insurance or a state medical card.  (Id. at 1050.)

When asked if she has any lingering effects of carpal tunnel syndrome, Douglass testified that her hands often feel numb or she has a "pins and needles" sensation.  (Id. at 1052.)  She said that the effects cause her to drop things often, and that she recently dropped a cigarette without even noticing because her hands were so numb.  (Id. at 1052-53.)

In describing her medications, Douglass testified that Seroquel, which is a sleep aid that she had been taking for three or four months, causes her to sleep for long periods of time.   (Id. at 1046.)  She said that it sometimes makes her sleep "for two or three days at a time," but that this effect "varies."  (Id. at 1046-67.)  When the ALJ asked whether she had discussed this side effect with her doctor, she replied, "he knows it makes me sleep."  (Id. at 1046.)

## C.    The Vocational Expert's Testimony

The ALJ also took testimony from Vocational Expert ("VE") Ronald Malik, who testified that a person who is limited to light work involving only occasional overhead reaching and postural activities, moderately complex tasks, and occasional contact with the public, supervisors, and coworkers would not be able to perform Douglass's past job as a laundry laborer.  (A.R. 1074.)   The VE testified that a person with those limitations could perform a number of other jobs, including supply clerk, grain clerk, loading checker, and shipping checker.  (Id. at 1075-76.)

9

He testified that all of those jobs exist in significant numbers in the regional economy. (Id.) When asked by Douglass's attorney whether she could perform those jobs if she had to miss three to four days per month because her medications make her drowsy, or if she had to lay down with a heating pad for a couple of hours, the VE said those limitations would preclude employment. (Id. at 1078.)

## D.    The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Douglass is not disabled under sections 216(i) and 223(d) of the Social Security Act. (A.R. 712.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a), which requires him to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet the listings, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether the claimant can return to her past work or to different available work. 20 C.F.R. § 404.1520(f), (g).

10

The ALJ's post-remand decision largely tracks the original decision at steps one and two of the analysis; he found that Douglass has not engaged in substantial gainful activity since October 29, 2003, and that she has severe impairments in the form of a back disorder, depression, and PTSD. (Id. at 703.) He explained that he does not consider Douglass's carpal tunnel syndrome to qualify as a severe impairment because she had not reported any manipulative difficulties to her doctors since 2008 and her smoking habit requires her to constantly grasp small objects. (Id.) At step three the ALJ determined that none of Douglass's impairments individually or in combination meet or medically equal any listed impairment. (Id.) In evaluating Douglass's mental impairments at this stage, the ALJ found that she has only mild restrictions in activities of daily living and moderate restrictions in social functioning and with regard to concentration, persistence, or pace. (Id. at 704.)

The ALJ's assessment of Douglass's RFC at step four of the analysis also echoed his original decision. The ALJ determined that Douglass has an RFC to perform light work involving only occasional overhead reaching and postural activities, moderately complex or detailed tasks, and occasional contact with the public, co-workers, or supervisors. (Id. at 705.) In reaching that determination, the ALJ incorporated by reference his original analysis of the pre-September 2008 medical record and then engaged in a lengthy credibility analysis incorporating his review of the more recent medical evidence. (Id. at 706-10.) The ALJ found Douglass's credibility to be lacking and so discounted her testimony and gave little

weight to any medical reports that are based only on her subjective statements. (Id. at 706.) The ALJ gave a long list of reasons for his dim view of Douglass's credibility, pointing to what he sees as inconsistencies between her testimony and the medical record, discrepancies in her testimony, her lack of compliance with recommended treatment, and her presentation during the hearing. (Id. at 706-08.) He also noted that several recent medical records described her mental impairments as being only moderately severe and as improving with medication. (Id. at 708-09.) For those reasons, the ALJ found that although Douglass's RFC leaves her incapable of performing her past work, he nonetheless determined at step five that there are a number of jobs that exist in significant numbers in the national economy that she remains able to perform. (Id. at 710-11.) Accordingly, the ALJ found that Douglass is not disabled, and denied her applications for benefits. (Id. at 712.)

## Analysis

In reviewing the ALJ's decision to deny Douglass's application for benefits, this court is limited to ensuring that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quotation and citation omitted). The court's role under this standard of review is "extremely limited," in that it is "not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder*, 529, F.3d at 413. Instead, this court asks "whether the

ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In applying that standard, this court must bear in mind that the ALJ "'need not provide a complete written evaluation of every piece of testimony and evidence'" to survive judicial review. *See Pepper*, 2013 WL 1338123, at *8 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).

## A.     Law of the Case Doctrine

Douglass's first challenge to the ALJ's decision consists of her argument that his decision to adopt by reference his original analysis of the pre-September 2008 medical evidence into the current opinion violates the law of the case doctrine. The law of the case doctrine—which applies to administrative agency proceedings, *see Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991)—requires the ALJ "to conform any further proceedings on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart," *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (quotation omitted). According to Douglass, in its July 2010 opinion this court "already made a finding that the objective medical evidence supports Douglass's pain allegations and establishes that she suffers from a myriad of physical and mental impairments." (R. 17, Pl.'s Br. at 57.) She argues that in light of the ALJ's decision not to reexamine the preexisting medical records on remand, the law of the case doctrine binds him to what she characterizes as the court's finding that the objective evidence supports her allegations.

Douglass's law of the case argument misreads both the court's original decision and the scope of the doctrine itself. In the context of social security cases, the law of the case doctrine only applies to issues that the reviewing court fully decided. *Key*, 925 F.3d at 1061. It does not apply where an issue is left open, such as where the ALJ remains "free to reinterpret the evidence or to take new evidence." *See Wilder*, 153 F.3d at 804. In its July 2010 opinion, this court left open the question of whether the medical evidence supports Douglass's claim that her impairments are disabling. If this court had resolved that question in Douglass's favor, as she now suggests, the court would have remanded the case for an award of benefits rather than for further proceedings. Instead, this court found the ALJ erred in discounting Douglass's credibility based on a blanket statement that "the medical record is not wholly consistent with" her allegations, without explaining the nature of those inconsistencies. (A.R. 740.) This court noted that there is medical evidence which "supports Douglass's pain allegations and establishes she suffers from a myriad of physical and mental impairments." (Id. at 740-41.) But that statement reflects a matter not in dispute. The ALJ acknowledged in both of his decisions that Douglass has severe mental and physical impairments. (Id. at 13, 703.) The point the court made in its original decision is that given the objective evidence of severe impairments, before discounting Douglass's credibility based on perceived inconsistencies with the objective evidence, the ALJ was required to "explain why the medical evidence was inconsistent with the level of pain and limitation Douglass described." (Id. at 742.) That explanation was especially

important because this court found that the other reasons that the ALJ gave for his original credibility assessment lacked support in the record or were insufficiently explained. (Id. at 743-50.) The court explicitly left open the question of whether the medical record supports the *extent* of the symptoms and impairments Douglass describes. Nothing in this court's decision bound the ALJ on remand to accept Douglass's characterization of the limiting effects of her impairments.

## B.   The ALJ's Credibility Assessment

The heart of Douglass's argument on appeal is her contention that the ALJ's credibility determination is unsupported by substantial evidence. An ALJ is required to give specific reasons for finding that a claimant's description of her symptoms lacks credibility. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). But once the ALJ provides those reasons, his credibility assessment is entitled to particular deference and will be overturned only if it is "patently wrong." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). In other words, as long as the credibility assessment is reasonable and supported, *see Getch*, 539 F.3d at 483, and does not ignore or mischaracterize relevant evidence, *see Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009), this court will not disturb it.

Even Douglass acknowledges that this is not a case in which the ALJ failed to give any reasons for discounting her credibility. In her opening brief she highlights twelve distinct reasons that the ALJ gave to explain why he disbelieved her allegations. (R. 17, Pl.'s Br. at 58-68.) Douglass instead attempts to show that each individual reason is either unsupported by or based on a mischaracterization of the

record. (Id.) Her argument approaches the border of requiring the kind of "nitpicking" of the ALJ's credibility analysis in which this court is not supposed to engage, *see Castile*, 617 F.3d at 929, but out of deference to the long road Douglass has traveled to reach this point in her disability proceedings, this court will address each contention head on.

Douglass first attacks the ALJ's treatment of her testimony that her Seroquel prescription sometimes causes her to sleep for two to three days at a time and that she is sometimes so depressed she stays in bed for up to seven days at a time. The ALJ considered that testimony to be exaggerated, explaining that the medical records reflect that Douglass repeatedly denied to her health care providers that her medication caused any side effects and that there is no evidence in those records that she ever reported extended sleep patterns or prolonged depressive episodes. (A.R. 707.) Douglass correctly points out that the only medical records reflecting that she denied having medication side-effects predate her Seroquel prescription and therefore have no bearing on whether she is exaggerating that medication's effects. But the ALJ's credibility decision is not required to be flawless, *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), and he correctly found that there are no medical records documenting her complaints of being so depressed she would stay in bed for up to seven days at a time. Douglass points to records notating that she has "sleep problems," fatigue, and "sleep disturbance," and argues that this evidence "may corroborate" her testimony. (R. 17, Pl.'s Br. at 59-60.) But this court is not empowered to overturn an ALJ's credibility determination just because the

evidence is subject to differing interpretations.  *See Elder*, 529 F.3d at 413.  It is the ALJ's role to interpret the evidence, *id.*, and Douglass has not highlighted any record that contradicts the ALJ's finding that she never reported the kind of prolonged episodes of total incapacity that she described at the hearing.

Next Douglass argues that the ALJ should not have viewed her descriptions of her past and present pain levels as being contradictory.  In discounting her credibility, the ALJ noted that Douglass testified at one point that her back pain had gotten worse since July 2008, but later contradicted herself by saying that her average pain level from 2005 through 2009 was an eight or nine while in 2011 it was only a seven or eight.  (A.R. 707.)  The ALJ found that this contradiction made it harder to trust Douglass's overall description of her pain levels.  Douglass argues that the discrepancy in her testimony only amounts to a contradiction "in a strict sense," and thus faults the ALJ for holding it against her.  (R. 17, Pl.'s Br. at 61.)  But it is up to the ALJ to weigh the importance of inconsistencies in the claimant's testimony, and this court's role is not to second-guess the balance he struck.  *See McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).  Even Douglass admits that she contradicted herself, and the ALJ was entitled to view that contradiction as one of the many reasons he gave for discrediting her testimony.

Douglass also argues that the ALJ should not have discredited her based on her testimony that she had last visited an E.R. six months before the hearing, when in fact her last visit occurred eleven months earlier.  According to Douglass, her answer was just "really uncertain, vague, indefinite," but "[d]efinitely not"

dishonest. (R. 17, Pl.'s Br. at 62.) Again, Douglass wants this court to ascribe less weight to her error than the ALJ did, but it is not this court's role to "reweigh the evidence or substitute [its] judgment for that of the ALJ's." *See Pepper*, 2013 WL 1338123, at *8. The ALJ was entitled to view Douglass's inability to provide accurate information about her treatment history as a reason to find her less credible overall.

Douglass also faults the ALJ for finding unconvincing her testimony that she did not seek E.R. treatment for her back pain more often because she lacked transportation and was too embarrassed to call an ambulance when she could not afford to cover its costs. Douglass challenges the ALJ's statement that she had told her healthcare providers that "she can provide her own transportation," asserting that there is no evidence of such reports in the record. But that statement is only one of the reasons the ALJ gave for disbelieving that transportation was a barrier to Douglass seeking E.R. treatment. The ALJ was skeptical of her testimony that embarrassment would prevent someone whose pain level is a ten out of ten—a state the ALJ had asked her to consider "the most excruciating pain imaginable," (A.R. 1062)—from seeking emergency care, (id. at 707). He also pointed out that Douglass has been able to find transportation to accomplish things like going to the post office, shopping, and getting various forms of government assistance. (Id.) Because the ALJ gave at least two supported reasons for disbelieving Douglass's testimony regarding her hesitation to seek E.R. care, this court will not overturn his decision to discount her explanation for her failure to seek more frequent care. *See*

*Berger*, 516 F.3d at 545 (noting that an ALJ's decision need not be flawless to survive judicial review).

Turning to the ALJ's treatment of her testimony describing her daily activities, Douglass argues that the ALJ should not have credited over her hearing testimony the answers she gave to a counselor at NCBHS who asked about her daily activities. (R. 17, Pl.'s Br. at 63-65.) The ALJ wrote in his decision that Douglass had "provided inconsistent information regarding daily activities," noting that she had testified that she performs few daily activities but told a counselor at NCBHS that she is able to "maintain her own residence, care for her own personal hygiene, pay bills, cook, and drive or use public transportation." (A.R. 707.) He also considered inconsistent with her description of her limited daily activities the evidence that she has been able to obtain for herself various other forms of assistance, including free eyeglasses, subsidized housing, and Wal-Mart vouchers. (Id.) Douglass does not now deny that there is a discrepancy between the testimony and the responses recorded on the form, but argues that it is the form, not her testimony, that the ALJ should have discounted because there is no way to know what specific questions the counselor asked. According to Douglass, the responses she gave the NCBHS counselor are of limited value because, she says, they are subject to differing interpretations.

Again, Douglass has not explained why this court should (or how it could, given the standard of review) credit her interpretation of the form over the ALJ's. *See McKinzey*, 641 F.3d at 889 (noting that court's role does not include reweighing

evidence). To the extent Douglass argues that the daily activities recorded in the form do not equate with the ability to perform full-time work, her argument misses the point of the ALJ's discussion. The ALJ did not find her able to perform light work because she said she can do things like shop and use the post office. Instead, he found that the inconsistencies between what she told her caregiver and how she testified at the hearing make her testimony regarding the extent of her symptoms harder to believe overall. (A.R. 707.) With respect to the ALJ's comments regarding Douglass's ability to obtain other benefits, it is unclear why the ALJ believed that securing public assistance is inconsistent with her description of her symptoms. There is no detail in the record to support the ALJ's assessment of whether someone with Douglass's claimed symptoms could have completed the steps required to access needed resources. But again, the main thrust of the ALJ's assessment—that Douglass gave different descriptions of her limitations to her caregiver than she gave to him—is supported by the record. The reasons the ALJ gives for discrediting a claimant need not all be valid, as long as enough of them are. *See, e.g., Simila*, 573 F.3d at 517.

Moving on to the question of Douglass's compliance with prescribed treatment, Douglass argues that the ALJ failed to give sufficient consideration to the causes of her noncompliance, including her on-going financial difficulties, transportation problems, and the nature of her mental health problems. (R. 17, Pl.'s Br. at 65.) Although the ALJ mentioned evidence that Douglass had not consistently taken prescribed medications, his main concern with respect to her

treatment compliance is the extensive evidence that she repeatedly failed to attend scheduled appointments. (A.R. 707-10.) In fact, the supplemental record shows that between 2008 and her second hearing, Douglass was discharged from mental health services at least twice "due to non-participation" or "lack of engagement." (Id. at 853, 972.) Notes from the free pain clinic also reflect that she was a frequent "no show" for scheduled appointments. (Id. at 1000-02.) In contrast to the ALJ's original decision where he failed to explore the reasons behind Douglass's noncompliance, (*see* id. at 747-48), this time the ALJ acknowledged Douglass's transportation difficulties, but found her explanation "without merit where she is capable of utilizing public transportation to obtain services" and other necessities. (Id. at 707.) At the hearing and in his written decision, the ALJ also expressed concern about Douglass's failure to call to cancel appointments, noting that if transportation—rather than lack of motivation—were truly the barrier to keeping appointments, she could have kept her caregivers informed of that problem. (Id. at 710.) In short, this is not a situation where the ALJ failed to explore or ignored the claimant's explanation for her failure to comply with treatment. *See, e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ considered Douglass's transportation (and inherently, her financial) difficulties, but found that barrier insufficient to explain the extent of her failure to attend scheduled treatment or her lack of diligence in calling to cancel or reschedule appointments.

Douglass also asserts that her noncompliance should not be a factor in the ALJ's decision because "there is no reason to believe that if Douglass had been more

diligent in her treatment, she would have been able to return to work." (R. 17, Pl.'s Br. at 66.) But again this argument misses the mark. Douglass has pointed to no evidence to show that her symptoms did not improve with prescribed treatment. In fact the record reflects the opposite; doctors often noted that her symptoms improved with medication. (A.R. 869, 907-08.) The ALJ found that if Douglass's depression and PTSD were as severe as she claims, she would have made a greater effort to attend therapy sessions, or at least would have informed her caregivers when she could not attend to avoid being discharged from treatment. Similarly, to the extent Douglass faults the ALJ for not explicitly exploring the impact her mental health issues have on her ability to follow through with treatment, the ALJ did implicitly address that point in repeatedly discussing her daily activities and ability to obtain other necessary benefits. (Id. at 707.) It is clear that the ALJ considered her capable of advocating for herself when she is motivated to do so. (Id.) Thus the ALJ was entitled to view Douglass's apparent apathy toward treatment as one of the many reasons he gave for discounting her credibility with respect to the severity of her symptoms.

Next Douglass points out that her back pain is a chronic condition that improves only temporarily with pain medication and argues that accordingly, it was unfair for the ALJ to note that she was always discharged from E.R. visits in stable condition. (R. 17, Pl.'s Br. at 67.) But it is not just the discharge notes that the ALJ considered in finding that the E.R. records do not support Douglass's description of the severity of her pain. The ALJ noted that none of the E.R. notes support a

finding that she was in severe pain upon arrival.  As he points out, the notes from her February 2009 E.R. visit reflect that while she reported a pain level of nine out of ten, she did not appear to be in acute distress and there were no abnormal findings during her examination.  (Id. at 708, 841-43.)  The records from her August 2010 E.R. visit show that she arrived in only "mild distress" and the notes from her October 2010 E.R. visit show that she was ambulatory upon arrival and reported her pain level as being at six out of ten.  (Id. at 710, 1005, 1010-11.)  The ALJ was entitled to conclude, as he did here, that even on the few occasions that Douglass sought treatment for her back pain, the treating physicians' observations of her condition do not support her claimed level of discomfort.

Douglass next argues that the ALJ erred in discounting her testimony based on her GAF score and reports that her symptoms improved over time.  (R. 17, Pl.'s Br. at 68.)  According to Douglass, the fact that she reported improvements to her doctors supports rather than undercuts her credibility.  But the ALJ's point in discussing this evidence is that she presented herself to the counselors at NCBHS in a different way than she described her condition to him at the hearing.  He noted that her mood improved with therapy to make the point that if her symptoms were interfering with her life to the extent she claimed, she would not have "stopped attending without calling."  (Id. at 710.)  Even if this evidence is subject to varying interpretations, Douglass has not demonstrated that the ALJ's view is "patently wrong."  *See Castile*, 617 F.3d at 929.

Finally, at least with respect to the credibility determination, Douglass argues that because she had testified that her pain level on the day of the hearing was only at a four out of ten, the ALJ should not have discounted her credibility based on his observations of her demeanor. (R. 17, Pl.'s Br. at 61.) The Seventh Circuit has acknowledged that what it refers to as the "sit and squirm" test is problematic because a claimant can easily manipulate his or her demeanor to display discomfort. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). Nonetheless, it has "repeatedly endorsed the role of observation in determining credibility." *Id.* (collecting cases). Here the ALJ noted that Douglass "betrayed no evidence of pain or discomfort while testifying," but he acknowledged that the hearing was "short-lived," and so in assessing her credibility he gave only "some weight" to her lack of obvious discomfort. (A.R. 707.) This is precisely the kind of subjective assessment that requires substantial deference, because it is based on the kind of intangible elements that only the ALJ is in a position to observe. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999); *see also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Because the ALJ's observations are entitled to considerable weight, *see Butera*, 173 F.3d at 1055, and because the ALJ gave a number of supported reasons to explain his decision, his credibility assessment survives judicial review.

## C. The ALJ's Treatment of Third-Party Statements

Douglass also challenges the ALJ's decision not to credit letters submitted by her son and two friends in support of her claims. (A.R. 830-36.) As she

acknowledges, the ALJ wrote that he considered those letters but found that their description of Douglass's condition lacks support. (Id. at 710.) Significantly, Douglass has not pointed to any medical evidence in her brief that she considers supportive of the witness's descriptions. (R. 17, Pl.'s Br. at 69-70.) The ALJ is not required to discuss in detail every bit of evidence in the record, and because he has sufficiently articulated his reasons for finding that Douglass's symptoms are not as severe as she claims, he did not err in failing to discuss the third-party statements in more detail. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *see also Limberopoulos v. Shalala*, 17 F.3d 975, 979 (7th Cir. 1994) (*overruled on other grounds*) (noting that an ALJ may discredit the input of interested witnesses).

## D.     Douglass's Combination of Impairments

Douglass's final argument is that the ALJ failed to consider the combination of her bipolar diagnoses, "complaints of dropping things," and headaches together with her other symptoms in determining her RFC. Her argument is premised on the rule mandating that where "an applicant has several medical problems, the ALJ must consider her condition as a whole." *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005). In other words, once the ALJ identifies a severe impairment, he must take into account the claimant's "entire constellation of ailments— including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). But an ALJ may discharge this duty by noting that the claimants' health problems are not severe enough "either singly

or in combination" to be disabling and by emphasizing that he has considered all of the symptoms together. *See Getch*, 539 F.3d at 483.

In crafting Douglass's RFC the ALJ explicitly said that he "has considered all symptoms" and that he considered the severity of her mental impairments "singly and in combination." (A.R. 704-05.) The ALJ considered Douglass's testimony regarding her difficulties grasping things, but found those complaints unpersuasive in light of her admission that she smokes cigarettes. (Id. at 703.) He noted that a smoker has to grasp small objects and concluded that her grasping problems are not as severe as she describes. (Id.) The ALJ considered her headaches but noted that she had not reported the problem to any healthcare provider since 2008. (Id. at 703.) Douglass calls that a "mistake," but pointedly, she points to no records to support her contention that she complained of headaches to a doctor. (R. 17, Pl.'s Br. at 69.) She also overlooks the ALJ's additional statement that there is no objective evidence that her headaches "affect the claimant's ability to sustain basic work activity." (A.R. 703.) Again, Douglass cites no evidence to refute that statement. As for her bipolar diagnosis, Douglass points to no evidence showing how any symptoms attached to that diagnosis impact her differently than the diagnoses of depression and PTSD that the ALJ explicitly considered. (Id. at 703-04.) The ALJ engaged in a detailed examination of how her mental impairments limit her in various areas of functioning, and Douglass makes no attempt to argue that this assessment would have been different using the bipolar diagnosis. As the government points out, the Social Security regulations treat depression and bipolar

26

syndrome under the same category of mood disorders for purposes of evaluating their impact on a claimant's ability to work. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. In sum, Douglass has made no attempt to argue that her non-severe impairments exacerbate her struggles with back pain or her mental health issues, despite her burden to show that the combination is disabling. *See Castile*, 617 F.3d at 927. Accordingly, this court finds no reversible error in the ALJ's handling of the totality of Douglass's impairments.

## Conclusion

For the foregoing reasons, Douglass's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**